U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**United States Bankruptcy Judge**

**Signed April 03, 2012**

---

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| CAPROCK WINE COMPANY, L.L.C. | § | Case No. 09-50576-RLJ-11 |
| | § | |
| CAPROCK REAL ESTATE | § | Case No. 09-50577-RLJ-11 |
| HOLDINGS, L.L.C. | § | |
| | § | |
| Debtors. | § | Jointly Administered under |
| | § | Case No. 09-50576-RLJ-11 |

| | | |
|---|---|---|
| | § | |
| MAX TARBOX, CHAPTER 11 TRUSTEE | § | |
| Plaintiff | § | |
| vs. | § | ADVERSARY NO.  10-05021 |
| | § | |
| DEVALMONT VINEYARDS, | § | |
| INC.—GRUET WINERY | § | |
| | § | |
| And | § | |
| | § | |
| LAURENT L. GRUET, INDIVIDUALLY | § | |
| AND AS THE ALTER EGO OF GRUET | § | |
| WINERY | § | |

1

## <u>CORRECTED MEMORANDUM OPINION</u>

Trial of the above-captioned adversary proceeding was held December 6 – 9, 2011, with a Supplemental Designation of Deposition Testimony filed December 16, 2011. Appearing at trial were Max Tarbox, the Chapter 11 Trustee ("Tarbox" or "Trustee") and plaintiff in this adversary proceeding, and Laurent L. Gruet ("Laurent"), defendant.

The subject matter of this lawsuit arises out of an auction of the bulk of the assets of these bankruptcy estates and a charge by the Trustee that Laurent both breached the contract that arose from the auction and committed fraud in connection with such contract. Upon consideration of the arguments of counsel, the testimony of the witnesses, the exhibits admitted into evidence at trial, and the pleadings filed in this adversary proceeding, the Court has concluded that Laurent breached the contract between him and the Trustee, but did not commit fraud in connection with such contract. The Court therefore awards damages and attorneys' fees to Tarbox as the chapter 11 trustee in the aggregate amount of $4,041,822.33.

The Court hereby sets forth findings and conclusions in support of its ruling.

## I.

## FINDINGS OF FACT

### A.  Background Facts: The Bankruptcy Filing and the Caprock Assets

1.    On December 23, 2009, Caprock Wine Company, L.L.C. and Caprock Real Estate Holdings, L.L.C. (collectively, "Caprock") filed their petitions for relief under chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101, *et. seq*).

2.    On February 5, 2010, the Court entered its order appointing Tarbox as the chapter 11 trustee in the cases.

3.    Title to certain real property consisting of an event center and attached winery, including fixtures, at 408 East Woodrow Road, Lubbock, Texas 79423, located on 24.59 acres of land having the property description of Block 20, Section 25, Abstract 413, Tracts 4A, 4F, and 4G, Lubbock County, Texas (the "Real Property"), was vested in Caprock Real Estate Holdings, L.L.C. and, thus, was property of the bankruptcy estate subject to the administration of the Trustee.[1]

4.    Title to certain personal property associated with the Real Property—the events center furniture and articles, wine tanks, wine making equipment, approximately 35,000 plus gallons of inventory consisting of case wine and bulk wine, two fork lifts, and landscape maintenance equipment (the "Personal Property")—was vested in Caprock Wine Company, L.L.C. and, thus, was property of the bankruptcy estate subject to the administration of the Trustee. Together, the Real Property and Personal Property will be referred to as the "Caprock Assets." The two Caprock estates will be referred to as the "Caprock Winery."

**B.  Laurent and Gruet Winery, Inc.**

5.    Laurent was (and still is) the head winemaker for Devalmont Vineyards, Inc. – Gruet Winery ("Gruet Winery, Inc."). Laurent is 46 years old. He was born in France and attended school in France until the age of 16, after which he attended, as he described it, "wine school." While attending wine school, he worked for his father's company, which was apparently named "SA Gruet," which was—and presumably still is—located east of Paris, France. SA Gruet makes and sells champagne.

---

[1] *See infra* Finding 15.

6.  Laurent's father was interested in making and selling "champagne" in the United States, where it is called "sparkling wine."[2] The culmination of this desire is Gruet Winery, Inc., which is headquartered in Albuquerque, New Mexico. Laurent has resided in Albuquerque since 1986.

7.  Gruet Winery, Inc. formerly operated under the name "Domaine Saint-Vincent, Ltd." *See* Plaintiff's Exhibit 53. Laurent owns 700 shares of Gruet Winery, Inc. and his three sisters—Nathalie, Jacqueline, and Isabelle—each own 600 shares. Laurent therefore owns 28% of the company with his sisters each owning 24%. Their respective ownership interests are evidenced by stock certificates of Domaine Saint-Vincent, Ltd.

8.  Gruet Winery, Inc. makes and sells sparkling wine. It sells sparkling wine in 45 states, according to Laurent. The Gruet family has been making wine in the United States, whether through Gruet Winery, Inc. or its predecessor entities, for almost 30 years. In addition to his ownership in the company, Laurent has continually served as an officer and board member.

9.  Laurent has a history of alcohol abuse; he has had several DWIs. To address his problem, he underwent treatment for four weeks at a facility in Arizona.

10. In December of 2009, as a result of Laurent's drinking problem and concerns regarding his financial irresponsibility and deceit, Laurent, who had been president of Gruet Winery, Inc., was removed as president of the company and his sister, Nathalie Gruet, was inserted as president. He was relegated to vice president of the company but maintained his position as chairman of the board. *See* Plaintiff's Exhibit 59. A few months later, in June of 2010, Laurent's role was further reduced. At a meeting of the

---

[2] Laurent explained that "champagne" and "sparkling wine" are basically the same but, in the industry, the champagne label means it actually comes from the Champagne region of France.

board of directors and shareholders, it was provided that "[n]either the president nor the vice president is entitled to act without being in alignment on issues outside the cost of production costing more than $5,000." As president, Nathalie was placed in charge of directing the daily business affairs, finances, employees, and communications with shareholders. *See* Plaintiff's Exhibit 62. Laurent's role was basically limited to that as winemaker.

11.   In July 2009, Laurent completed a credit application which reflected that he was making $8,333.33 per month and that he had over $1.8 million in assets. The assets included a residence valued at $750,000, his interest in Gruet Winery, Inc. valued at $660,000, and personal property valued at $130,000; it also reflected four accounts at New Mexico Bank & Trust valued at $1,800, $1,000, $56,902, and $39,387, respectively. *See* Plaintiff's Exhibit 78. At trial, Laurent testified that as a result of a divorce proceeding, he had to sell the residence and that he presently rents a place for $3,000 per month; he otherwise testified that his net worth was less at the time of trial than it was in July 2009. He further testified that at the time of trial he had two bank accounts, one with approximately $20,000 on deposit and the other with approximately $5,000 on deposit. On July 12, 2010 (*see infra* Part D), Laurent said he had a total of $120,000 in his accounts.

12.   Gruet Winery, Inc., according to Laurent, owes approximately $5 million to New Mexico Bank & Trust.

## C.  The Trustee's Motion to Sell the Caprock Assets

13.   On April 27, 2010, the Trustee filed his "Motion to Employ Real Estate Broker." On May 17, 2010, the Court entered an "Order Approving Employment of Real Estate

Broker for Trustee," which authorized the Trustee to employ Williams & Williams Marketing Services, Inc. d/b/a Williams & Williams Realtors ("Williams & Williams"), of Tulsa, Oklahoma, as real estate broker.

14. On May 14, 2010, the Trustee filed his "Motion to Sell All Assets by Auction Free and Clear of All Liens, Claims, and Encumbrances and Notice of Hearing" (the "Sale Motion"). On May 26, 2010, the Court entered an order granting the Sale Motion which authorized the Trustee to sell the Caprock Assets by auction free and clear of all liens, claims, and encumbrances (the "Auction"). Any buyer was also required to assume Caprock's responsibility to honor contracts with growers to buy grapes before the late summer wine-making season.

15. On June 30, 2010, the Trustee filed his "Motion to Amend Order on Sale of All Assets by Auction" (the "Amended Sale Motion"), which corrected the legal description of the Real Property by adding 14.59 acres that had been omitted from the legal description in the original Sale Motion. On July 7, 2010, the Court entered its "Order Amending Order Authorizing Sale of All Assets by Auction Free and Clear of All Liens, Claims and Encumbrances," thereby including the 14.59 acres associated with the Real Property to be sold at the Auction. By this order, the Trustee was authorized to sell the Caprock Assets by the Auction scheduled for July 12, 2010, at the Caprock Winery in Lubbock, Texas.

16. The Trustee's Sale Motion provided that the Trustee was selling the Caprock Assets free and clear of all liens, claims, and encumbrances, with all such interests attaching to the proceeds of the sale. In this regard, the Sale Motion disclosed that the assets were encumbered by a statutory lien in favor of Lubbock Central Appraisal District in the

6

amount of $163,910.45, and a lien in favor of Plains Capital Bank in the amount of $4,016,352.35. *See* Plaintiff's Exhibit 4. (The Trustee had also negotiated a "carve out" with Plains Capital Bank by which the bank agreed to relinquish a portion of the sales proceeds, assuming there was an insufficient amount raised from a sale to payoff the bank in full, for purposes of paying administrative claims and a dividend to unsecured creditors in the Caprock bankruptcy cases.)

17. The sale, according to the Sale Motion, was to be an "'AS-IS' sale subject to the terms and conditions set forth in the Broker's standard Contract of Sale (real property) and/or bidders' card (real and personal property)." *Id.* ¶ 12.

18. The Sale Motion provided notice that the "Trustee shall offer and sell the [Caprock Assets] by public auction . . . on the following terms and conditions: at least a 10% earnest deposit in the form of a personal check which Trustee authorizes Broker to accept . . . ; a closing within 30 (thirty) days of Trustee's acceptance or reasonable extensions thereof." *Id.* The Sale Motion further provided as follows:

> The earnest money deposit shall be . . . refundable to all unsuccessful bidders and shall be applied to the purchase price of the successful bidder. Should a successful bidder fail to close the sale within thirty (30) days from the date the order is entered by this Court approving the results of the auction, such party understands by participating in this procedure that it will forfeit its earnest money deposit and hereby further agrees to such treatment and to waive any and all defenses to such forfeiture. If the successful bidder fails to close the purchase, the Trustee is authorized to award the sale to the next highest bidder or bidders.

*Id.* ¶ 14.

19. The Court's order approving this sale provided that the Trustee was authorized to sell all the Caprock Assets by auction "as set out" in the Trustee's Sale Motion. It

further noted that the Trustee would "also file a Report of Sale with the results of [the] auction." Plaintiff's Exhibit 5 at 2.

**D. The Day of the Auction and the Auction of the Caprock Assets**

20. Laurent first learned of the Auction through an acquaintance, Greg Bruni. Bruni told Laurent about the Auction by an email he sent to Laurent on Friday, July 9. The email included a brochure prepared for the Auction. Laurent paid an associate's son to drive him to Lubbock to attend the Auction. Laurent's plan was to buy the Caprock Winery, manufacture sparkling wine in Texas, and raise enough money in a short amount of time to buy-out his sisters and become the sole owner of an expanded Gruet Winery, Inc.

21. The Auction was held at the Caprock Winery on Monday, July 12, 2010. Laurent arrived at the Caprock Winery and, prior to registering for the Auction, took a tour of the facility. He then registered at the registration desk and, as with all potential bidders, was given a packet of information. Laurent received and signed a "Confidentiality and Non-Reliance Agreement," under which he agreed to not disclose information provided him as a potential bidder at the Auction. *See* Plaintiff's Exhibit 6. The packet included a brochure with information regarding the real and personal property to be sold. (The brochure emailed to Laurent by Greg Bruni was the same brochure, or an excerpted version.) The fourth page of the brochure set forth the terms of the Auction sale. The packet also included a sample contract that would be entered into after the Auction with the winning bidder. The packet included other information pertaining to licensing, utilities, taxes, etc., all regarding the Caprock Winery and its operations.

22. Laurent was also given the "Sale Day Notes," which highlighted certain information from the more detailed sale terms contained in the previously described packet—that the

property was being sold "AS IS, WHERE IS"; that bidders were agreeing to be bound by the terms of the "Contract and its Addenda which are incorporated by reference into your bidding"; that the buyer would receive a title policy; and that "[e]ach high bidder must make a 10% non-refundable deposit" and, for such, "[p]ersonal checks are accepted." Plaintiff's Exhibit 8.

23. Laurent signed a bidder registration card, which identified him as a bidder at the Auction; he was assigned Bidder No. 802. Laurent signed the registration card as "Laurent Gruet" without any designation that he was signing on behalf of any other person or entity. For a question on the card—"What best describes your occupation?"— Laurent checked the box for "CEO/Owner." *See* Plaintiff's Exhibit 9. He likewise signed the Confidentiality and Non-Reliance Agreement in his personal name, though in a space for contact information, he stated his company as "Gruet Winery." Plaintiff's Exhibit 6.

24. Prior to beginning the actual Auction, Tommy Williams of Williams & Williams explained how the Auction would proceed and addressed various matters concerning the Auction itself and the property being sold. He stated that "each high bidder must make a 10% non-refundable deposit" and that the balance of the purchase price was due within 30 days.

25. The Auction elicited several bids, culminating in Laurent's final and highest bid of $6,500,000. The next highest bid was $6,250,000.

26. When asked by reporters after the Auction if he would have bid higher, Laurent remarked that he would have bid at least $10 million because he "does not like to lose."

**E. Post Auction – Meeting with Gloria Gilleland, Problems with the Earnest Money Deposit; Laurent and Trustee Sign Contract**

27. After being declared the winning bidder and then meeting with the media, Laurent met with Gloria Gilleland of Williams & Williams. Gilleland asked Laurent how he wished to pay the 10% earnest money deposit (the $650,000, which sometimes will be referred to as the "Deposit"). While the testimony is conflicting as between Gilleland and Laurent concerning precisely what was discussed—Laurent contending he did not understand that $650,000 was required (he said he understood he needed $50,000) and that he talked to "Angel" at New Mexico Bank & Trust to arrange for wiring of $50,000; Gilleland testified that Laurent told her that he did not have his check book for the Deposit and that Laurent was aware that $650,000 was required, which was specifically discussed with Angel—Gilleland understood that she (through Williams & Williams's account) was to receive wired funds from New Mexico Bank & Trust for the Deposit. This understanding was based on her conversation with Laurent and a brief phone conversation she had with Angel at the bank. Gilleland's testimony concerning the precise nature of the discussions between her and Laurent is credible.

28. Before receiving the wire, Gilleland left the Caprock facility and flew back to Williams & Williams's offices in Tulsa, Oklahoma. She had asked that she receive confirmation of receipt of the Deposit. The Deposit was not sent that day, July 12, however. The next day, July 13, 2010, a $50,000 wire transfer was received by Williams & Williams. The funds were wired from Laurent's personal account at New Mexico Bank & Trust.

29. During their meeting (Laurent's and Gilleland's), Laurent signed the Contract for Sale of Real Estate at Auction (the "Contract"). He signed the Contract in his personal capacity, "Laurent Gruet." In blank spaces, Gilleland filled-in that the deed name would be in

"Gruet Winery"; that the purchase price was $6,500,000.00. The "down payment" amount was left blank. *See* Plaintiff's Exhibit 11. Gilleland testified that she had Laurent sign three copies of the Contract. There are multiple copies of the Contract with Laurent's signature. *See* Plaintiff's Exhibits 11, 12, 13, and 14.

30. Prior to the Auction, Gloria Gilleland had never heard of Gruet Winery, Inc. or, for that matter, any enterprise operating under the name of Gruet Winery. This apparently came up during her meeting with Laurent and immediately following the Auction. Any such understanding that she had concerning any entity named Gruet Winery was superficial. There was no discussion to the effect that Gruet Winery, Inc. was to be purchaser of the Caprock Assets. The mere mention of "Gruet Winery," without more, is not sufficient to create an understanding or reasonable expectation that Gruet Winery, Inc. was purchasing the Caprock Assets.

31. The Trustee met Laurent for the first time immediately after the Auction. Laurent gave him his business card, which has his name as "Laurent Gruet" with a physical address, phone and fax numbers, and an email address. It also has "GRUET" in large block letters spelled out below a crest emblem. It does not reflect or mention a corporate entity or reflect that Laurent is an officer or representative of any entity. *See* Plaintiff's Exhibit 86.

32. Tarbox signed the Contract as Chapter 11 Trustee on behalf of "CAPROCK REAL ESTATE HOLDINGS, LLC, A TEXAS LIMITED LIABILITY COMPANY AKA CAPROCK WINE COMPANY, LLC, A LIMITED LIABILITY COMPANY." *See* Plaintiff's Exhibit 13. He signed the Contract on July 13, 2010, and, according to his testimony, he signed one copy of the Contract.

33. The Trustee signed the Contract based on his understanding that Laurent made a representation that the $650,000 Deposit would be made to Williams & Williams. The receipt of the two $50,000 deposits convinced the Trustee to extend the time for Laurent to pay the Deposit.

**F.  What Laurent Knew at the Time of the Auction and His Efforts After the Auction to Raise the Deposit**

34. On July 12, Laurent did not personally have $650,000, nor did he have ready access to funds of that amount. *See supra* Finding 11. Prior to attending the Auction, Laurent had made no arrangements to obtain funds for any deposit or down payment, and he had made no effort to even determine whether he could come-up with funds necessary to buy the Caprock Assets, assuming he was the winning bidder at the Auction. He had not attempted to contact potential investors or lenders prior to the Auction and, most important, he had no significant liquid assets for use in purchasing the Caprock Assets.

35. Laurent testified that he initially thought that he just needed $50,000 for a deposit at the Auction. He also testified that once he realized $650,000 was required, he thought that he could perhaps borrow the necessary funds from Gruet Winery, Inc. This obviously does not address the purchase price of $6,500,000, however.

36. The Trustee accepted the $50,000 wire transfer on July 13, 2010, for the purpose of granting Laurent additional time (he told Laurent, one day) to raise the $650,000. Later that same week, Laurent told the Trustee that he needed to go to France to raise the necessary funds for the balance of the $650,000 Deposit. The Trustee insisted that Laurent pay an additional $50,000 as a way to buy more time. Laurent therefore left a $50,000 personal check with the Trustee and, on the same day, July 16, he had a $50,000

12

wire transfer from his personal account sent to the Trustee. The Trustee, therefore, never negotiated the $50,000 check.

**G.  Laurent's Breach and the Trustee's Response**

37.  Laurent was unable to obtain the balance of the Deposit while in France. Upon his return, he told the Trustee that he could not raise the Deposit and admitted that he could not go forward with the purchase. Both Laurent's and the Trustee's testimony confirm their mutual understanding that Laurent was obligated to pay the $650,000 Deposit.

38.  By letter dated July 26, 2010 from Williams & Williams to Laurent, it was confirmed as follows:

> [O]n Thursday, July 22, 2010, you communicated to Mr. Tarbox, the Chapter 11 Trustee of Cap*Rock Winery, . . . that Gruet Winery would not be able to tender the remaining balance of the required down payment, perform its obligations pursuant to the Contract for Sale, or close on the above referenced Property on or before the required closing date of August 11, 2010. Your actions have left the Trustee with no other choice than to immediately begin mitigating the damages resulting from the failure of Gruet Winery to perform.
> . . .
> Nothing in this letter should be construed as waiving any rights which the Trustee and Williams and Williams have against you and Gruet Winery as a result of your actions. The Trustee intends to pursue any and all legal remedies available in law or in equity to recover damages against [Laurent] . . . .

Plaintiff's Exhibit 24.

39.  On July 26, 2010, the Trustee filed his emergency motion with the Court for authority to conduct a second auction of the Caprock Assets, which auction was to be done on sealed bids. *See* Plaintiff's Exhibit 25. The Court granted the motion and the second auction took place on August 3, 2010, upon which the high bid came in at $2.5 million. The next highest bid at the second auction was $800,000.

13

## H. Laurent's Conduct/Terms of the Contract

40. The Caprock Winery was a unique business with unique assets. The Trustee, through the Auction, was attempting to maximize the value of the Caprock Asssets for the benefit of Caprock's estates and its creditors, and was seeking to do so by selling the assets as a going concern. The timing was critical. Laurent's reckless conduct destroyed all benefits sought to be achieved through the public auction.

41. The Contract contains the following provisions:

> OFFER, ACCEPTANCE AND CLOSING DATE: As the high bidder at an Auction of the Property by Seller, as recorded by the Auctioneer ("Broker"), Buyer made and hereby makes an irrevocable offer ("offer") under the terms herein to purchase the Property being offered and/or described herein. The offer shall be irrevocable by the Buyer for fourteen (14) days from the date herein. Seller may accept the offer during this period or thereafter. The Buyer shall be bound by the offer unless and until Broker receives from Buyer a revocation of the offer after the fourteen (14) day timeframe and prior to notification to Buyer by Broker of Seller's acceptance of their offer.
> . . .
> Buyer expressly acknowledges being advised by Broker in sales literature and again at or prior to auction registration: that (1) the Buyer would be bound by this Contract, including all Addendums (incorporated by reference are Seller's Addendum, if any; a Property Disclosure or Disclaimer Statement, if any; and the EPA/HUD pamphlet provided Buyer prior to bidding titled "Protect Your Family from Lead In Your Home"); and (2) TO NOT BID IF BUYER HAD NOT READ AND AGREED TO BE BOUND BY THIS CONTRACT AND ITS ADDENDUMS IN THEIR ENTIRETY.
> . . .
> BREACH OR FAILURE TO CLOSE: The parties agree that if SELLER has performed Seller's obligations under this Contract, and if at the Closing the Buyer fails to pay the balance of the Purchase Price or to perform any other obligations under this Contract, then Seller may, at Seller's option, either a) unilaterally cancel and terminate Buyer's right to purchase the Property, including all legal and equitable interest, if any, Buyer may have regarding the Property and retain all sums previously paid on the Purchase Price as liquidated damages, or b) elect to recover from Buyer the actual damages incurred by Seller, including loss of the balance of the Purchase Price, costs of resale, attorney's fees, and such other incidental damages as may be lawfully recovered. If BUYER has

14

> performed Buyer's obligations under this Contract and Seller fails to perform its obligations under the Contract, then Buyer may, as Buyer's sole and exclusive remedy, terminate Buyer's obligation to purchase the Property, by written notice to Seller, and recovery to Buyer shall be limited to the down payment deposit on the property.

Plaintiff's Exhibit 11.

42. Laurent obviously understood that he was the high bidder with his $6,500,000 bid and that he therefore had offered the Trustee such sum for purchase of the Caprock Assets. He also understood, either at the Auction or immediately after the Auction during his meeting with Gilleland, that he was required to pay $650,000 as earnest money on the purchase.

43. The day after the Auction, Laurent met with Chris Gibbon, an officer with New Mexico Bank & Trust, in an effort to raise the $650,000 Deposit. Laurent testified that he was attempting to borrow the necessary funds from Gruet Winery, Inc. At the time, he had no authority to bind Gruet Winery, Inc. on such loan, even if Gruet Winery, Inc. had the ability to make a loan in that amount. Laurent knew he had no such authority; more important, he knew that neither he nor Gruet Winery, Inc. had any ability whatsoever to raise the $6,500,000 required for the purchase. Laurent's conduct in this regard was reckless.

**I.  The Trustee's Suit Against Laurent, Gruet Winery, Inc., and Laurent as Alter Ego**

44. The Trustee sued Laurent, Gruet Winery, Inc., and Laurent as Alter Ego of Gruet Winery, Inc. The Amended Complaint ("Complaint") [Docket No. 20] asserts causes of action for breach of contract, statutory fraud (under Tex. Bus. & Com. Code Ann. § 27.01), and common law fraud, among other claims. The Court granted Gruet Winery, Inc.'s motion for summary judgment, releasing it from all liability on all matters.

## II.

## CONCLUSIONS OF LAW

**A.  Generally – Jurisdiction; Applicability of Texas Law; Preservation of Claims**

1.  The Trustee alleged that this adversary proceeding is a core proceeding pursuant to
    28 U.S.C. §§ 157(b)(2)(A),(N), and (O); and that this Court has jurisdiction over the
    subject matter of this proceeding. *See* Complaint ¶¶ 14-15. Laurent, by his answer,
    admitted such allegations. *See* Second Amended Answer ¶¶ 8-9 [Docket No. 29]. The
    Court therefore has jurisdiction to adjudicate this adversary proceeding. Laurent has
    consented to this Court's adjudication of this adversary proceeding. S*ee* 28 U.S.C. §§
    1334, 157(b),(c).

2.  The causes of action brought here by the Trustee for breach of contract and fraud
    concern a contract formed in Texas for the purchase of real and personal property
    located in Texas. Texas law, therefore, governs the substantive issues in this case.

3.  At trial, Laurent, through counsel, argued that the Trustee had not properly raised and
    preserved his claims here—particularly the breach of contract cause of action—
    against Laurent personally because the Trustee's pleadings principally target Gruet
    Winery, Inc. This charge by Laurent is based on the Trustee's allegations made in the
    Complaint as opposed to the "Joint Pretrial Order" [Docket No. 124].

4.  The Joint Pretrial Order, which was prepared by counsel for each of the parties and
    approved and entered by the Court on December 2, 2011, clearly provides that the
    Trustee asserts claims against Laurent for breach of contract, fraud in the inducement,
    common law fraud, statutory fraud, and promissory estoppel. Laurent did not, in the
    Joint Pretrial Order, dispute whether such claims were properly pleaded and properly
    before the Court. He does, however, rely upon a footnote in the Joint Pretrial Order

stating that "he is not waiving his right to object to any claims raised by the Plaintiff in the Joint Pretrial Order which were not pleaded in the amended complaint, but which are raised for the first time in the Joint Pretrial Order, and hereby objects to those new claims." Joint Pretrial Order at 15 n.1.

5.      The Court does not accept the footnote as properly raising an issue of whether such claims against Laurent were raised by the Trustee. Condoning such a blanket reservation of rights in a pretrial order would undermine the purpose of a pretrial order. Stating the litigants' claims and defenses in the pretrial order is a fundamental requirement for a pretrial order. *See* Local Bankruptcy Rule 7016-1(a)(1). Once a pretrial order is entered, it supersedes all other pleadings and governs the issues and evidence to be presented at trial. *See Rockwell Int'l Corp. v. U.S.*, 549 U.S. 457, 474 (2007); *Elvis Presley Enters. v. Capece*, 141 F.3D 188, 206 (5th Cir. 1998). Matters not included in the pretrial order are waived, even if they are raised in the complaint. *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002); *Kona Tech. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000).

6.      Even were the Court to consider Laurent's argument to have been preserved by the footnote, the Court is satisfied that both the Complaint and the parties' actions in this adversary proceeding reflect that the Trustee fully intended to bring a breach of contract claim (and the other claims) against Laurent and that Laurent was on notice that the claims were made against him personally.

7.      The original complaint initiating this adversary proceeding is entitled, "Complaint for Breach of Contract against Gruet Winery *and Laurent Gruet*, Statutory Fraud under Texas Business and Commerce Code §27.02 *against Laurent Gruet*, and for Common

Law Fraud *against Laurent Gruet*." [Docket No. 1] (emphasis added). Such complaint was amended, identified herein as the Complaint. *See* Finding 44. The allegations set forth in the Complaint emphasize the causes of action asserted against Gruet Winery, Inc. "acting by and through Laurent" and, indeed, refer to the Contract as being executed by the Trustee and Gruet Winery, Inc. (or its Alter Ego). *See* Complaint. Despite this, the Complaint also alleges that the "Defendants breached the Contract" by failing to pay either the Deposit or the $6.5 million purchase price; it states that the "Defendants' breach caused injury to the Trustee, which resulted in actual damages in the amount of $4,000,000.00." Complaint at 10. With respect to the statutory fraud claims, the Complaint provides that "[i]n the event that Defendants contend that the representations enumerated herein . . . were false in that Laurent did not have the authority to enter into the Transactions, Laurent and Gruet Winery's Alter Ego made representations of fact that were false." *Id.* at 11. It goes on to provide that false representations were made, that they were material, and that "Laurent and Alter Ego either intended or had reason to believe that the Trustee would enter into the Contract in reliance on the False Representations." *Id.* Similar allegations were made with respect to the common law fraud cause of action. The Complaint states that "[t]he False Representations were made by Laurent . . . with the intention of not fulfilling them," and that "[t]he False Representations were made . . . by Laurent . . . in order to induce the Trustee to enter into the Transaction and the Contract." *Id.* at 11-12 ¶ 42. Finally, the prayer specifically seeks damages against "Gruet Winery and/or Laurent Gruet and/or Laurent Gruet as the Alter Ego of Gruet Winery" and pre-judgment and post-judgment interest "against each and every

Defendant found liable." *Id.* at 18. Laurent's answer to the Complaint is obviously made on behalf of Laurent individually and raises no defense that is asserted on the basis that he is not the party to the Contract or that he was not the party making the representations complained of.

8.   Most telling is Laurent's "Motion for Summary Judgment" [Docket No. 59], which was denied by this Court's order of November 30, 2011. The brief in support of the motion specifically states that "[t]he Trustee brought this action against Laurent and the Gruet Winery alleging breach of contract and fraud claims against Laurent." Laurent's Brief in Support of his Motion for Summary Judgment, at 6 [Docket No. 60]. "The Trustee contends that Laurent entered into a valid and binding contract with the Trustee for the purchase of Caprock Winery." *Id.*

9.   The pleadings raise claims of breach of contract and fraud against Laurent and Laurent so understood the pleadings. *See McCauley v. City of Chi.*, No. 09-3561, 2011 U.S. App. LEXIS 21179, at *40 (7th Cir. Oct. 20, 2011) ("The primary purpose of notice pleading under [Fed. R. Civ. Proc. 8 and therefore Bankr. R. 7008] is notice."); *In re Caldwell*, No. 02-41931, 2004 Bankr. LEXIS 2503, at *14-15 (Bankr. D. Idaho May 17, 2004) ("The primary criterion, then, in determining whether a deficient pleading constitutes a complaint under Fed. R. Bankr. P. 7008 is notice of the nature of relief claimed.") (citing *Dominguez v. Miller (In re Dominguez)*, 51 F.3d 1502, 1509 (9th Cir. 1994))).

## B.  The Trustee's Breach of Contract Claim

10.   The Trustee alleges that, on behalf of the bankruptcy estate, he entered into a Contract with Laurent, that Laurent breached the contract, and, as a result, he is

entitled to damages that cover the estate's loss caused by Laurent's breach. The Court agrees with the Trustee.

11. As the successful bidder at the Auction, Laurent further manifested his intentions by signing the Contract. *See* Finding 29. In doing so, he made an offer to the Trustee that was irrevocable for fourteen days. *See* Finding 41. The Trustee then had the right to accept such offer within the fourteen days. *Id.* Laurent could only revoke his offer after the fourteen days provided the Trustee had not already accepted. *Id.* The Trustee accepted Laurent's offer by signing the Contract. *See* Findings 32, 41. A contract was formed between the parties.[3]

12. Upon Laurent's return from France, he advised the Trustee that he was unable to raise the necessary funds for the Deposit and would be unable to go forward and close the sale pursuant to the Contract. Laurent thereby repudiated the Contract, which, given his repudiation occurred prior to the closing date under the Contract, constituted an anticipatory breach of the Contract. *See Glass v. Anderson*, 596 S.W.2d 507, 510 (Tex. 1980). The Texas Supreme Court, in *Glass*, stated as follows:

> When Anderson repudiated the contracts in early June, time for performance fixed by the contracts clearly had not yet arrived. The June repudiation, therefore amounted to merely an anticipatory breach. At that time, Glass had the right to pursue several different courses of conduct: (1) he could have treated the anticipatory breach as a total breach of contract and sued for his damages; (2) he could have materially changed his position in reliance on the repudiation; (3) he could have indicated to the other party that he considered the repudiation to be final; or (4) he could have done nothing and awaited the contractual time of performance.

---

[3] The Court's construction is consistent with Texas law regarding auctions. In Texas, a binding contract is formed between an auctioning party and a high bidder after the "fall of the hammer" or the end of the bidding in an auction in any "other customary manner," with the additional requirement of a written, signed document memorializing any sale that must satisfy the statute of frauds. *See* Tex. Bus. & Com. Code § 2.328(b); *Cherryhurst Props. V. Larry Latham Auctioneer's, Inc. (Tex. Corp.)*, No. 01-96-01458-CV, 1998 Tex. App. LEXIS 5982 (Tex. App.—Houston [1st Dist.] Sept. 24 1998). Here, after the close of the bidding, there was a proper memorialization, which was the Contract signed by both parties. The parties' signatures bound them to the Contract.

*Id.* (internal citations omitted).

13. The Trustee chose to treat Laurent's anticipatory breach as a breach of the Contract and, by filing suit here, properly sought contract damages for the breach.

14. Laurent contends that the $650,000 Deposit was a condition precedent to the Trustee's authority to enter into the Contract and that the *Trustee's failure* to collect the entire Deposit thereby negated or invalidated the Contract. This is reinforced, Laurent argues, by the Trustee and Laurent signing the Contract with the down payment amount left blank. The Court disagrees. The Trustee, at all times, insisted that Laurent pay the Deposit. The Trustee, *at Laurent's request*, simply gave Laurent additional time to make the Deposit. S*ee* Finding 36. Laurent bought the additional time with the two $50,000 wire transfers. *Id.*

15. The Trustee's conduct complied with the authority granted him by the Court in connection with the Auction. The Court approved the Auction, which was held in conformance with such approval. The Auction was a public sale which, at the time, had to be considered a great success. The Trustee's Sale Motion stated the Trustee would obtain Court approval of the Auction "results." *See* Finding 18. This is consistent with the requirement imposed on the Trustee under Rule 6004(f) of the Federal Rules of Bankruptcy Procedure, which requires that, upon *completion* of a sale by public auction, a Trustee must file a report of the sale with the court. Of course, the Auction "results" were skewed by Laurent's failure to fund the Deposit. The Trustee was put in limbo *by Laurent*. There was never a completed sale to report to the Court. But, once the Trustee learned Laurent could not close, the Trustee moved immediately to arrange another sale.

21

16. The parties signed the Contract and, as signed, the Contract merely confirms that, with respect to a "down payment," no down payment was received, which was true. *See* Finding 29. The Contract did not condition its validity on the receipt of a $650,000 earnest money deposit. In addition, even were the Court to consider the many items of parol evidence—the Sale Motion, the Auction Brochure (Finding 21), the Sale Day Notes (Finding 22), and the auctioneer's pre-auction statements (Finding 24)—as creating a requirement on Laurent's part to pay the $650,000 Deposit and that such requirement was satisfied by his tendering of a personal check, the Court is satisfied such requirement was in fact met. Rather than submitting a personal check, Laurent promised that he would wire the required funds to Williams & Williams. This change was accepted by the Trustee. Laurent cannot now take advantage of the Trustee's willingness to accommodate Laurent regarding a requirement (the earnest money deposit) that clearly benefitted the Trustee as the seller under the Contract. *See Martin v. Xarin Real Estate, Inc.*, 703 F.2d 883, 887-88 (5th Cir. 1983). And Laurent cannot use the Trustee's accommodation as a means to invalidate the Contract. *See id.* In addition, even if the Deposit were construed to be a condition precedent to the Contract, the Trustee, as the seller and thus the beneficiary of the condition, is allowed to modify the condition. *See Ames v. Great S. Bank*, 672 S.W.2d 447, 449 (Tex. 1984) ("Performance of a condition precedent . . . can be waived or modified by the party to whom the obligation was due by word or deed."). The Trustee never wavered from his insistence that the Deposit be paid. He, at most, modified the requirement of a personal check by accepting, instead, Laurent's promise of a wire transfer; he then granted Laurent additional time given Laurent's

22

two $50,000 wires.

17. Laurent relies on *In re Landscape Properties, Inc.*, 100 B.R. 445 (Bankr. E.D. Ark. 1988), for his argument that the Contract was not enforceable because the Court never formally approved the Contract. *Landscape Properties* does not support Laurent, however. *Landscape Properties* concerned a bankruptcy court's reconsideration of its decision to *not* approve a *private sale* proposed by a bankruptcy trustee on the basis there was a higher offer for the property being sold. The court, upon reconsideration, determined that it was best to have another hearing at which the first purchaser would be allowed to present his reasons why his offer was the better offer. As such, *Landscape Properties* is simply not applicable here. It concerned a private sale proposed by a trustee with an objection being lodged and hearing held on the issue. The court there simply made the point that for the private sale before it, for which court approval was sought over an objection lodged with a competing offer (denominated as a "real estate contract"), no contract existed without court approval. *Id.* at 447. Here, the Trustee filed his Sale Motion to which no objections were filed. The Court approved the sale by auction. In addition, the sale here was by public auction, which the court in *Landscape Properties* specifically suggested was the preferred way to sell property by a trustee. *Id.* at 447 ("It may be that the only avenue available to the Trustee which would accommodate all the concerns and which will accord the fullest possible measure of fairness and finality is by way of a public auction."). The Trustee here had full authority to sell the Caprock Assets by, first, the public auction and, second, by the sealed bid auction after Laurent breached the Contract resulting from the first auction.

23

18. Most important, at trial, Laurent's own testimony never belied his understanding that he was required to pay the Deposit of $650,000. Laurent knew that, upon becoming the high bidder, he was obligated to pay the Trustee the non-refundable earnest money deposit of $650,000.

19. Laurent informed the Trustee on July 22, 2010, nine days after the Trustee signed the Contract, that he would not be able to come-up with the money. On July 26, the Trustee sent Laurent a letter stating that "the Trustee intends to pursue any and all legal remedies available in law or in equity to recover damages against [Laurent]." *See* Finding 38.

20. On July 27, 2010, the Court held an emergency hearing granting the Trustee authority to auction the property again; the Trustee provided Laurent with notice of the hearing.

21. While the Trustee's conduct regarding Laurent may have prevented the Trustee from cancelling the Contract *if* Laurent paid the Deposit, it did not constitute a waiver of the Trustee's rights to sue if Laurent breached the Contract.

> It is a fundamental proposition of contract law that when one party breaches its contract, the other party is put to an election of continuing or ceasing performance, any action indicating an intention to continue will operate as a conclusive choice, not depriving the injured party of his cause of action for the breach which has already taken place, depriving him only of any excuse for ceasing performance on his own part.

*Shafer v. Gulliver*, No. 14-09-00646-CV, 2010 Tex. App. LEXIS 9021, at *22-23 n.6 (Tex. App.—Houston [14th Dist.] Nov. 12, 2010) (citing *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 858 (Tex. App.—Dallas 2005, pet. Denied) (quoting *Cox, Colton, Stoner, Starr & Co., P.C.*, v. *Deloitte, Haskins & Sells*, 672 S.W.2d 282, 287 (Tex. App.—El Paso 1984))).

24

22. Laurent signed the Contract and was thereby bound by its terms. Then, a few days later, he breached the Contract.

## Contract Damages

23. The Trustee seeks $4 million in damages—the difference between the Contract price and the price the Caprock Assets ultimately sold for.

24. Laurent argues that his liability, if any, is limited to the $100,000 he paid the Trustee, which he submits constitutes liquidated damages under the Contract.

25. Laurent references paragraph 7 of the Contract, which states as follows:

> [If Buyer breaches]  Seller may, at Seller's option, either a) unilaterally cancel and terminate Buyer's right to purchase the property, including all legal and equitable interest, if any, Buyer may have regarding the Property and retain all sums previously paid on the Purchase Price as liquidating damages, or b) elect to recover from Buyer the actual damages incurred by Seller, including loss of the balance of the Purchase Price, costs of resale, attorney's fees, and such other incidental damages.

Contract ¶ 7. Laurent sees a simple situation: the Trustee was allowed to either retain the funds already paid or sue for damages; as the Trustee retained the $100,000, he cannot collect any additional damages.

26. The clause does not foreclose the Trustee's ability to sue for breach of contract and actual damages if he did not return the $100,000. The wording of clause "b" contemplates the Trustee suing for the "balance" of the purchase price. It therefore allows the Trustee to keep the $100,000 and sue for the "balance" of the purchase price.

## Mitigation of Damages

27. Laurent contends that the Trustee failed to sufficiently mitigate his damages. Laurent argues that the Trustee should not have let Laurent into the Auction, should not have

allowed Laurent to leave the Auction site without paying the Deposit, and should have earlier realized that Laurent could not pay. Laurent also argues that the Trustee rushed into the second auction in which the Trustee only received two written bids, with the highest one being $4 million less than Laurent's bid.

28.  A party, using reasonable effort, has a duty to mitigate when another party breaches a contract. *See, e.g.*, *Stanley Manly Boys' Clothes, Inc. v. Hickey*, 113 Tex. 482, 486 (1924).

29.  In effect, Laurent's mitigation argument is that the Trustee did not act reasonably because he and his agents trusted Laurent. As addressed in more detail in the analysis of the fraud claim (*see infra* Part II.C.), the Court finds this argument to be without merit. Laurent is an adult. The Trustee was entitled to rely on Laurent.

30.  The Trustee acted reasonably concerning the second auction; there is no evidence to support otherwise.

31.  The Trustee also acted reasonably in undertaking a sealed bid process for the second auction. It is unfortunate that the highest bidder in the second auction was significantly less than what the Trustee probably would have received at the first live Auction, even without Laurent's bids. Still, this kind of backwards-looking nitpicking is not proper for mitigation analysis.

32.  The Contract damages are simple. Laurent agreed to pay the Trustee $6.5 million for the Caprock Assets; he paid the Trustee $100,000. The Trustee sold the Caprock Assets for $2.5 million. Laurent is liable for $3.9 million ($6.5 million - $2.5 million - $100,000) in benefit-of-the-bargain damages. *See, e.g., Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 728 (Tex. App.—Houston [1st Dist.]

1984).

**Attorneys' Fees**

33. The Trustee may recover attorneys' fees for his successful breach of contract claim. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8).

34. The Trustee submitted that he incurred an amount of $378,357.00 in attorneys' fees and $47,110.01 in expenses, for a total of $425,467.01. *See* Plaintiff's Exhibit 36. These fees are presumed to be reasonable under section 38.003 of the Texas Civil Practice & Remedies Code. Laurent has not attacked whether the work was actually performed or whether it was performed in good faith.

35. Laurent submits, however, that the fee amount is too high because the Trustee brought overlapping, but not identical, actions against both Laurent and Gruet Winery, Inc. for breach of contract, fraud, and promissory estoppel.

36. When discrete legal services advance both recoverable and unrecoverable claims which are sufficiently intertwined, they need not be segregated. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006). A plaintiff may not, however, recover fees expended solely on an unsuccessful cause of action. *Id.*

37. The Trustee's fees are only *presumed* to be reasonable; Laurent properly challenged the propriety of the amount of the fees. *See* Tex. Civ. Prac. & Rem. Code § 38.003. Laurent is only liable for fees for services by the Trustee's attorneys that advanced the Trustee's breach of contract claim. The Trustee's evidence of fees and expenses are the fee statements of counsel that itemize services chronologically with a description of services for each entry. *See* Plaintiff's Exhibit 36. They do not, however, allocate the fees by defendant—Laurent and Gruet Winery, Inc.—or by

27

cause of action—fraud, breach of contract, and other claims. The Court therefore has to wield a mallet for a task that is most properly left to a scalpel. The Court will err on the side of awarding too little rather than too much given the Trustee's failure to allocate his attorneys' bills.

38. Laurent is not liable for fees from services relating to claims against Gruet Winery, Inc. for estoppel, agency by estoppel, piercing the corporate veil, vice principal, and alter ego. In other words, he does not have to pay for much of the legal work performed by the Trustee's attorneys in explaining or analyzing Gruet Winery, Inc.'s corporate structure, history, practices, and interaction with the Trustee.

39. Laurent is not properly charged for attorneys' fees concerning the Trustee's fraud claims, both against Laurent and against Gruet Winery, Inc., that are separate from the Trustee's breach of contract claim. This consists mostly of the Trustee's effort to prove exemplary damages and to prove Laurent's knowledge of his fraud.

40. It is proper to charge Laurent for attorneys' fees that concerned causes of action that applied to both his and Gruet Winery, Inc.'s alleged breaches of contract, such as the Trustee's considerable work proving-up the existence of a valid contract. Laurent is also responsible for work that concerned his individual conduct in entering into the Contract and then repudiating it, even if this overlaps with work concerning the Trustee's claims that Laurent was an alter ego, agent, vice principal, and any and every kind of corporate representative of Gruet Winery, Inc.

41. Upon review of the fee statements, the Court concludes that at least one-third of the Trustee's attorneys' work was either exclusively devoted to prosecuting the breach of contract claim against Laurent or sufficiently intertwined with such claim. The Court,

therefore, awards attorneys' fees and expenses of $141,822.33 to the Trustee on his breach of contract claim.

## C. The Trustee's Fraud Claims

42. The Trustee has brought causes of action against Laurent for both statutory and common law fraud arising from Laurent's representations on the day of and in connection with the Auction.

43. The Trustee's fraud claims are related to Laurent's breach of contract. The Trustee submits that Laurent defrauded him because Laurent did not have the ability, at the time he signed the Contract, to perform and the Trustee was damaged as a result. In effect, the Trustee submits that Laurent *knew or must be charged with knowing* that he had no ability to pay the $6.5 million and that, at a minimum, Laurent was reckless by offering and promising to pay the $6.5 million.

44. As a general rule, a breach of contract claim does not implicate a fraud claim. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (cited by *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998)). The Trustee's case certainly appears to sound in contract. It is predicated on contract discussions, a signing of a contract, the breaching of a contract, and damages deriving from the terms of a contract. The Texas Supreme Court, however, has noted that fraud actions that concern a contract may be brought as tort actions if the fraud action arises from a separate legal duty owed by the defendant. *See, e.g.*, *Formosa*, 960 S.W.2d at 45-47. Fraudulent inducement claims, like the one brought here by the Trustee, can fit within this category. *Id.* at 47 (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986)).

29

45. A traditional fraudulent inducement claim is one in which a party makes a misrepresentation, at least recklessly, regarding the subject matter of the contract (e.g., the quality/quantity of chattels or land). A cause of action for statutory or common law fraud may arise if a party promises to perform a contract that he has no intention of performing. *See Weinberger v. Longer*, 222 S.W.3d 557, 562-63 (Tex. App.—Houston [14th Dist.] 2007) (citing *Spoljaric*, 708 S.W.2d at 435); Tex. Bus. & Com. Code Ann. § 27.01(a)(1). False representations or promises that induce another to enter into a contract that is then breached can be a basis for a fraud claim under both statutory and common law.

46. By bidding at the Auction, Laurent represented that he would pay his bid price; it reflected his stated intention and promise to buy the Caprock Assets for the amount of his bid. His ultimate bid of $6.5 million was his most basic representation and promise. The problem is that Laurent had no realistic ability to pay his ultimate bid amount or, for that matter, any of his bid amounts that culminated in his winning bid. *See* Findings 11, 34, 40, 42, 43. He compounded the situation by promising to wire the $650,000 Deposit. Such representation further deceived the Trustee into believing Laurent could close on the sale. The fact that he was unable to raise the Deposit further evidences his inability to pay the purchase price of $6.5 million. The Trustee justifiably relied upon such representations in accepting the Contract.

47. The Trustee did not rely upon any representations by Laurent as referring specifically to Gruet Winery, Inc.; the Trustee had no knowledge of the existence of Gruet Winery, Inc. He testified that he considered Laurent and "Gruet Winery" as one in the same. The Trustee is an experienced, highly competent attorney; Williams &

30

Williams is, similarly, an experienced, well-regarded auctioneering company. Both the Trustee and his agent, Williams & Williams, fully understood the significance of Laurent's signatures on the relevant documents and that, in each instance, Laurent signed in his personal capacity and not on behalf of Gruet Winery, Inc. *See* Findings 23, 29, 30, 31. Laurent did not make a representation that he was bidding for and purchasing the Caprock Assets for Gruet Winery, Inc.

## Statutory Fraud Claim

48.     The Trustee has brought fraud claims against Laurent under section 27.01 of the Texas Business & Commerce Code. Section 27.01(a) provides as follows:

> (a)     Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
>
> > (1) false representation of a past or existing material fact, when the false representation is
> > > (A)   made to a person for the purpose of inducing that person to enter into a contract; and
> > > (B)   relied on by that person in entering into that contract; or
> >
> > (2)  false promise to do an act, when the false promise is
> > > (A)   material;
> > > (B)   made with the intention of not fulfilling it;
> > > (C)   made to a person for the purpose of inducing that person to enter into a contract; and
> > > (D)   relied on by that person in entering into that contract.

Tex. Bus. & Com. Code § 27.01(a). The statute has two, independent prongs, with section 27.01(a)(1) concerning false representations and section 27.01(a)(2) false promises. The Trustee has brought claims against Laurent under both of these subsections.

49.     The elements under section 27.01(a)(1) are (1) a material misrepresentation made by a party; (2) that was made to induce a party to enter a contract; (3) involving real

estate in Texas; (4) that was relied upon by the party in entering the contract; and (5) that caused injury. *See, e.g., U.S. v. Lacy*, 234 F.R.D. 140, 149 (S.D. Tex. 2005) (citing Tex. Bus. & Com. Code Ann. § 27.01(a)(1)). *Mens rea* is not required. *Id.*

50.    The Trustee contends that Laurent made false representations that induced the Trustee into entering into the Contract—specifically, that Laurent represented he was a purchasing agent of Gruet Winery, Inc. However, the Trustee, who had never heard of Gruet Winery, Inc. before the Auction, would have entered into the Contract regardless of Laurent's relationship or non-relationship with Gruet Winery, Inc. *See supra* Conclusion 47. Instead, what mattered to the Trustee was Laurent's *promise* to perform under the Contract.

51.    The Trustee's statutory fraud claim is thus properly brought under section 27.01(a)(2) which concerns false promises, specifically, here, Laurent's promise to pay the Trustee the Contract price and otherwise perform under the Contract.

52.    The elements of subsection (a)(2) are similar to subsection (a)(1), except (a)(2) requires that a party made a false promise to another with "the intention of not fulfilling it." Tex. Bus. & Com. Code § 27.01(a)(2). So, while subsection (a)(1) does not require *mens rea* on the part of the defendant, subsection (a)(2) does. *Compare Lacy*, 234 F.R.D. at 149 ("[(a)(1)] . . . does not require proof of knowledge or recklessness as a prerequisite to the recovery of actual damages"), *with* 17-252 Dorsaneo, Texas Litigation Guide § 252.23 ("[U]nder [Tex. Bus. & Com. Code § 27.01], the elements vary depending on whether the person has made a false representation or a false promise. . . . A false promise to do an act constitutes fraud when it is . . . made with the intention of not fulfilling it."); *In re Nix*, 92 B.R. 164,

32

172 n.11 (Bankr. N.D. Tex. 1988) (approving of a jury charge under section 27.01(a)(2) that asked the jury to find whether "the defendants *willfully* committed the fraud [under (a)(2)]") (emphasis added).

53. The Court cannot conclude that Laurent never subjectively intended to pay the Contract price and honor all contractual obligations at the time the Contract was entered into. *See Schmermerhorn v. CenturyTel, Inc. (In re SkyPort Global Communs., Inc.)*, No. 08-36737, 2011 Bankr. LEXIS 123, at *147 (Bankr. S.D. Tex. Jan. 13, 2011) ("[Section 27.01] only requires that the false promise or false representation be relied upon by a party in entering [into] a contract. [Section 27.01] only look[s] at the time up to and including the execution of the contract for the fulfillment of any of [its] elements. Thus, the point in time when the harm from such a transaction is held to occur must be the time of the effectuation of the offending contract."). Laurent's conduct and statements—bidding at the Auction, his promise to wire the Deposit, his trip to France to raise the necessary funds—indicate his intent to purchase the Caprock Assets. *See Morton v. Kelley*, 2010 Tex. App. LEXIS 8347 (Tex. App.—Houston [1st Dist.] Oct. 14, 2010) (quoting *Spoljaric*, 708 S.W.2d at 434-35) ("[W]hile a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made."). His conduct was reckless but not made with the specific intent *not* to honor his promise to buy the Caprock Assets. The Court denies the Trustee's statutory fraud claim against Laurent.

**Common Law Fraud**

54. As a general rule, common law fraud is established "by showing proof of the

33

following elements: a material misrepresentation that was false, was known to be false when made or was made recklessly as a positive assertion without knowledge of its truth, that was intended to be acted upon, that was relied upon, and which caused injury." *Trinity Indus. v. Ashland, Inc.*, 53 S.W.3d 852, 867 (Tex. App.—Austin 2001) (citing *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998)). But, like statutory fraud claims, fraudulent inducement claims under Texas common law are broken down into two categories: misrepresentations and promises. A party need only be reckless to be liable for a fraudulent misrepresentation. *See Weinberger*, 222 S.W.3d at 562-63 (citing *Spoljaric*, 708 S.W.2d at 435). However, for a party to have an actionable fraud claim regarding a false promise of future performance, the party must prove that, at the time the promise was made, the counterparty made the promise with "no intention of performing" it. *Morton v. Kelley*, No. 01-09-00428-CV, 2010 Tex. App. LEXIS 8347, *16 (Tex. App.—Houston [1st Dist.] Oct. 14, 2010) (quoting *Formosa*, 960 S.W.2d at 47-48).

55.   As discussed above (*see* Conclusion 53), Laurent made a false promise to pay $6.5 million and such promise was reckless; it was not, however, made with the requisite intent—i.e., the intent *not* to pay despite his promise. The Court denies the Trustee's common law fraud claim.

## D.  Conclusion

56.   The Trustee was promised $6.5 million but received only $2.6 million as a direct result of Laurent's conduct. The Court awards the Trustee $3,900,000.00 for his breach of contract claim, plus attorneys' fees of $141,822.33. The Trustee is also awarded costs of court as allowed by law.

57.    Given the Court's findings and conclusions on the Trustee's breach of contract and fraud claims, it is not necessary to address the Trustee's promissory estoppel cause of action.

58.    The issues raised in this matter involve mixed questions of fact and law. Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Memorandum Opinion ###